In re DAK INDUSTRIES INCORPORAT-
ED, a California corporation, Debtor.

DAK INDUSTRIES, INCORPORATED,
a California corporation, Plaintiff,

v.

DOT–LINE TRANSPORTATION,
a California corporation,
Defendant.

Bankruptcy No. LA 92–33128 SB.
Adv. Nos. LA 92–03826 SB,
LA 92–03099 SB.

United States Bankruptcy Court,
C.D. California.

Aug. 17, 1995.

Jay D. Fullman, Costa Mesa, CA, for Dot–Line.

Christopher W. Combs, Levene & Eisenberg, Los Angeles, CA, for DAK Industries.

Harry Hochman, Pachulski, Stang, Ziehl & Young, Los Angeles, CA, for Official Committee.

Edward M. Wolkowitz, Robinson, Diamant, Brill & Klausner, Los Angeles, CA, Chapter 7 Trustee for DAK Industries.

James B. Yobski, Bronson, Bronson & McKinnon, Los Angeles, CA, for Trustee.

## FINDINGS OF FACT, CONCLUSIONS OF LAW and MEMORANDUM DECISION RE: MOTION FOR SUMMARY JUDGMENT

JAMES M. MARLAR, Visiting Judge.

Before the Court is DAK's *Motion for Summary Judgment*. A hearing was conducted on March 8, 1995. Having reviewed the pleadings filed with the Court, the Court now renders Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. DAK was a direct marketer of consumer electronics and computer products, primarily through the use of mail order catalogs.

2. DAK obtained shipping and delivery services from defendant Dot–Line Transportation ("Dot–Line").

3. On August 9, 1991, Dot–Line and DAK entered into a written contract for product shipment purposes, entitled "Interstate and Intrastate Transportation Contract" (the "Dot–Line Contract").

4. In connection with those shipments which Dot–Line picked up from DAK, Dot–Line issued freight bills which carried a notice to DAK that a carrier's lien might arise on *future* shipments:

> ICC REGULATIONS REQUIRE PAYMENT WITHIN 15 DAYS OF PRESENTATION. FAILURE TO PAY BILLED CHARGES MAY RESULT IN A LIEN ON FUTURE SHIPMENTS, INCLUDING THE COST OF STORAGE AND APPROPRIATE SECURITY FOR THE SUBSEQUENT SHIPMENT(S) HELD PURSUANT TO CALIFORNIA CIVIL CODE SECTION 3051.5.

5. Prior to June 11, 1992, DAK was indebted to Dot–Line, for previous shipments, in the amount of $50,805.50.

6. On June 11, 1992, Dot–Line picked up 2801 units of electronic equipment, worth over $300,000 (the "Merchandise"), from DAK's facility in Canoga Park, California for delivery to United Parcel Service in New Jersey.

7. Later that same day, on June 11, 1992, DAK filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

8. On June 15, 1992, Dot–Line wrote a letter to DAK in which Dot–Line asserted that it was exercising its right to a carrier's lien on the June 11, 1995 shipment, under California Civil Code Section 3051.5. Dot–Line's June 15, 1992 letter also stated: "It is Dot–Line's intention to hold these goods under the terms on CA Civil Code Section 3051.5, and further demands full settlement of all outstanding invoices owed to it by DAK Industries in the exact amount of $50,805.80."

9. On July 14, 1992, this Bankruptcy Court entered its Order approving the Stipulation re Deposit of $55,000 in a Segregated Account for Adequate Protection (the "Stipulation") and, in connection therewith, ordered that DAK deposit $55,000 into a segregated account, and that Dot–Line turn over to DAK the 2800 units of electronic equipment held under the pre-petition lien for freightage so that DAK could sell the 2800 units free and clear (the "Order"). DAK was directed to deposit $55,000 into a joint, segregated, interest-bearing trust account at Bank of America in the names of DAK and Dot–Line (hereinafter the "Court–Ordered Account"). The Bankruptcy Court also ordered that no disbursements were to be made from the court-ordered account without a further court order.

10. The transfer of the merchandise to Dot–Line on June 11, 1992, and the transfer of Dot–Line's carrier's lien to the Merchandise (hereinafter collectively the "Transfers") occurred within ninety (90) days prior to the Petition Date.

11. At the time of the Transfers, Dot–Line was a creditor of DAK.

12. As a result of the Transfers, Dot–Line received 100% of its pre-petition claim against DAK.

13. In 1979, the SBA filed a UCC–1 financing statement to perfect its security interest in substantially all of DAK's presently existing and after-acquired assets, including inventory. The SBA has had a perfected first priority security interest in substantially all of DAK's presently existing and after-acquired personal property since April, 1979.

14. In 1987, Tokai Bank of California ("Tokai") filed a UCC–1 financing statement perfecting its security interest in substantially all of DAK's presently existing and after-acquired assets, including inventory. Tokai has had a perfected second priority interest in substantially all of DAK's presently existing and after-acquired assets, including inventory, since 1987.

15. On July 1, 1992, an adversary proceeding was commenced by the filing of

DAK's Complaint alleging claims for relief: (1) Sale Free and Clear of Lien, (2) Violation of the Automatic Stay, (3) Preference, (4) Breach of Written Contract, (5) Conversion, (6) Intentional Interference with Business Relations, (7) Declaratory Relief, (8) Injunctive Relief, and (9) Attorneys' Fees ("DAK's Adversary Complaint").

16. On or about August 10, 1992, Dot–Line filed an Answer to DAK's Adversary Complaint, and a Counterclaim, alleging seven claims for relief against DAK. On August 21, 1992, Dot–Line withdrew all of its counterclaims against DAK.

17. DAK's Adversary Complaint requests that this Court enter a judgment against Dot–Line for preference avoidance and for recovery of the Transfers, pursuant to Bankruptcy Code §§ 547 and 550, for violation of the automatic stay, for conversion, and for declaratory relief.

18. From the commencement of its Chapter 11 case, until December 12, 1994, DAK operated as a debtor-in-possession. When this Court entered its Order converting DAK's case to one under Chapter 7 of the Bankruptcy Code, a trustee was appointed.

19. On December 15, 1994, Edward M. Wolkowitz was appointed Chapter 7 trustee for DAK (the "Trustee"). As such, the Trustee is the real party in interest in this adversary proceeding, pursuant to Federal Rule of Bankruptcy Procedure 7017.

20. Dot–Line had a carrier's lien on the Merchandise pursuant to California Civil Code § 2144 and § 3051.5.

21. DAK required that the customers who ordered the Merchandise pay for postage and handling in addition to the product price.

22. When DAK shipped the orders to the customers who ordered the Merchandise, DAK charged them customers for postage and handling.

23. At the time DAK shipped the orders of the customers who ordered the Merchandise, DAK caused the customers' credit card accounts to be debited for the cost of the Merchandise, plus postage and handling.

24. Customers who ordered the Merchandise paid DAK for the Merchandise and postage and handling at or before delivery of the Merchandise to Dot–Line.

25. DAK sold the Merchandise to its customers at or before the time the Merchandise was delivered to Dot–Line.

## LEGAL DISCUSSION AND CONCLUSIONS OF LAW

### A. Preferences.

We begin by considering whether Dot–Line's carrier's lien may be avoided as a preference. The purpose of recovering preferences is to equalize the ultimate distribution among creditors, and to insure that no creditor receives more than similarly situated creditors. Admittedly, the 90–day period preceding the bankruptcy filing, which is the benchmark for recovering most payments which are considered "preferential," is arbitrary. However, the history of preference recovery is long and established in the jurisprudence of bankruptcy law. *See generally, 4 Collier on Bankruptcy* § 547.01. The recovery of preferential transfers to creditors, which transfers occur within a specified period preceding the bankruptcy, is intended to foster the overall beneficial and philosophical purpose of "equality of distribution" between all creditors. Recovery of preferences insures that certain "preferred" creditors will not receive more on their obligations than they would receive if sharing with other creditors on a pro-rata basis, when a company is ultimately liquidated. *In re Bullion Reserve of North America,* 836 F.2d 1214 (9th Cir.); *cert. denied,* 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988).

Nevertheless, some transactions, which would otherwise be avoidable as preferences, are excepted from the definition of a preference. Such exceptions are enumerated in § 547(c) and include statutory liens. A statutory lien is defined in § 101(53) as a:

lien arising solely by force of a statute on specified circumstances or conditions, or lien of distress for rent, whether or not statutory, but does not include security interest or judicial lien, whether or not

such interest or lien is made fully effective by statute.

Specific examples of statutory liens included in the legislative history are mechanics', materialmen's, and warehousemen's liens and property tax liens. House and Senate Report (Reform Act of 1978), reprinted in Norton Bankruptcy Law and Practice 2d Bankruptcy Code and Related Legislation, Legislative History, and Editorial Commentary (1994–1995 Edition Revised). According to *Collier's*, the thrust of this meaning is "to make clear the distinction between the statutory lien and the consensual lien...." *4 Collier On Bankruptcy*, ¶ 545.02, 545–7.

In this case, Dot–Line argues that its carrier's lien is statutory in nature. The shipping contract between Dot–Line and DAK includes no language regarding the imposition of any consensual lien. (DAK Evidence Appendix, Exhibit D to Exhibit D). The lien is therefore premised only upon statutory provisions which allow for its creation and existence. Thus, Dot–Line contends that the lien arises and exists solely by operation of law. The trustee disagrees, claiming that the definition of a statutory lien is confined to liens which arise *automatically* without any effort from the party claiming the same, which is, in fact, what the legislative history says. The trustee claims that a carrier's lien does not arise automatically because the statute requires the carrier to give notice before the lien arises.

In resolving this dispute, the Court is reminded of a comment made by Benjamin N. Cardozo:

[Some judges'] notion of their duty is to match the colors of the case at hand against the colors of many sample cases spread out upon their desk. The sample nearest in shade supplies the applicable rule.... If that were all there was to our calling, there would be little of intellectual interest about it. The man who had the best card index of the cases would also be the wisest judge. It is when the colors do not match, when the references in the index fail, when there is no decisive precedent, that the serious business of the judge

begins. He must then fashion law for the litigants before him.

Benjamin N. Cardozo, *The Nature of the Judicial Process* 20–21 (1921). The present case is one where the sample cases do not precisely match the matter at issue. Consequently, this Court will fashion the law for the litigants.

There are two statutory provisions which give rise to carrier's liens. The first is *Cal. Civ.Code* § 2144 which provides as follows:

A carrier has a lien for (a) freightage and for services rendered at request of shipper or consignee in and about the transportation of the property, (b) care and preservation of the property, (c) money advanced at request of shipper or consignee to discharge a prior lien, and (d), subject to the limitations specified in Section 3051.6, any fines, penalties, costs, expenses, and interest arising from the provision of false or erroneous certifications of gross cargo weight as required by Section 508 of Title 49 of the United States Code. The carrier's rights to this lien are regulated by the title on liens.

*Cal.Civ.Code* § 2144. This provision gives a carrier a lien with respect to the obligation that arose as a result of the transport of *that* shipment. But a carrier can also have a lien with respect to any obligation that arose as a result of the transport of *prior* freight:

A carrier has a lien on freight in its possession for the total amount owed the carrier by the shipper for freightage, charges for services and advances due on freight previously delivered upon the promise of the shipper to pay freightage, charges and advances, as provided in this section.

*Cal.Civ.Code* § 3051.5(a). However, the statute goes on to provide that:

The lien provided by this section shall not arise:

(1) Unless the carrier has notified the shipper, in writing, that failure to pay billed charges may result in a lien on future shipments, including the cost of storage and appropriate security for the subsequent shipment held pursuant to this section.

*Cal.Civ.Code* § 3051.5(b). In other words, before such a lien can arise, a carrier must affirmatively provide notice to the shipper. Dot–Line's freight bills include printed language to this effect. The trustee argues that such a carrier's lien does not arise automatically.

This reasoning is flawed, however, because it assumes that the required notice creates the subsequent lien. However, that is not the case. If a carrier has previously provided the required notice, in writing, the statute then provides that the "carrier *has* a lien on freight in its possession." In other words, if notice has previously been given, then the lien arises automatically upon the carrier taking possession of *later* freight delivered into its possession. Alternatively, even if a carrier provides the required notice, no lien will arise if it does not take possession of additional freight. Thus, the noticing requirement does not create a lien, it merely creates the circumstances under which a lien can arise automatically thereafter.[1]

The drafters of § 101(53) clearly contemplated that statutory liens might be contingent upon events such as noticing. The definition in the statute expressly includes liens which arise "on specified circumstances or conditions." In this Court's view, the California provision for giving notice is precisely that type of specified circumstance or condition. Thus, the trustee's argument on this point must fail.

Next, the trustee argues that Dot–Line's lien is not statutory because it arose through an implied agreement of the parties. Because Dot–Line was required to give and, in fact, gave notice to DAK that it would impose a lien on future shipments if any part-due balance was unpaid, the trustee argues that DAK impliedly consented to the lien by voluntarily delivering to Dot–Line a subsequent shipment. This, according to the trustee,

operated to modify the Shipping Agreement, rendering the lien consensual, thereby arising out of contract rather than statute. This argument calls for too wide a stretch.[2] Extended to its logical conclusion, reliance on implied consent would eventually encompass all liens arising out of statute and could thereby completely eliminate the concept of statutory liens under appropriate circumstances. For instance, if a auto mechanic included boilerplate language on his work orders giving the customer notice that a mechanics' lien will arise if the bill is not paid and the customer still authorizes the work, has the customer consented to the lien in the event of nonpayment, thereby making it a consensual lien? If so, does that remove any subsequent lien from the definition of a statutory lien, despite the specific mention of such liens in the legislative history? This Court thinks not. This same rationale applies to the carrier's lien in question here and, hence, the trustee's second argument must also fail.

This Court also finds that the authority cited by the trustee for the notion that the notice created a contract or an agreement between Dot–Line and DAK to be distinguishable. For instance, the trustee cites *In re Vescovo*, 125 B.R. 468 (Bkrtcy.W.D.Tex. 1990). In *Vescovo*, the debtor posted a supersedeas bond with the clerk of the court so that he could appeal the plaintiff's judgment against him. Later, after he filed bankruptcy, the court concluded that the lien claimed by the clerk of the court, by virtue of Rules 47 and 48 of the Texas Rules of Appellate Procedure, was not a statutory lien.

> [The lien] was created solely by the voluntary act of the Plaintiff taken in accordance with rights afforded him under the Texas Rules of Appellate Procedure. It is, therefore, a consensual lien.

---

1. Notably, a portion of Dot–Line's lien, for a current shipment, arose pursuant to § 2144, which has no notice requirement. Such portion of the lien clearly arose automatically and constitutes a statutory lien.

2. Indeed, the trustee's own argument belies the credibility of this approach. In discussing the definition of a statutory lien, the trustee argues

that "the crux is, whether, in order to validate the lien, the parties must have *expressly* agreed to its existence (emphasis added)." *Notice of Motion And Motion For Summary Adjudication of Issues; Memorandum of Points And Authorities*, February 16, 1995, page 14, note 7. Implied and expressed consent to a lien are two very different concepts.

*In re Vescovo, supra* at 473. The trustee argues that Dot–Line's lien was, likewise, consensual because it arose upon DAK's voluntary act of delivering inventory to Dot–Line's custody. This Court disagrees. In *Vescovo*, the debtor delivered the bond to the clerk for the specific purpose of securing the appellee's interest in the judgment against the debtor. In this case, however, DAK did not deliver the inventory to Dot–Line for the purpose of securing its prior obligation. To the contrary, DAK delivered the inventory so that it could be delivered to DAK's customers. This difference is critical and, therefore, this Court must conclude that Dot–Line's carrier's lien is distinguishable from the lien in *Vescovo*.

This Court is also unpersuaded by the trustee's reliance upon 13 *Am.Jur.2d, Carriers,* § 273 (2d ed. 1964). That authority was cited for the proposition that a shipper who receives a bill of lading, without objection and after an opportunity to inspect, and thereafter permits the carrier to act on it by proceeding with the shipment, is presumed to have accepted it, as creating a contract and to have assented to its terms. This Court does not dispute the validity of such authority, but finds it inapplicable and unpersuasive here. DAK may, in fact, have impliedly consented to the imposition of the carrier's lien, but this Court does not view such consent sufficient to render the lien consensual, rather than statutory, in nature. It is one thing for a party to be aware that its business dealing may eventually give rise to a lien and to impliedly consent to such lien by continuing with the transaction; it is a completely different thing for a party to specifically agree to give another party a lien on property. In this Court's view, the difference between implied and express consent is also the difference between a statutory and consensual lien. Thus, Dot–Line's carrier's lien is a statutory lien, exempt from the reach of the trustee's avoidance powers. Given this, this Court need not consider whether the Dot–Line lien otherwise qualifies as a preference.

**B. *Determination of Secured/Unsecured Status Under Section 506.***

 This conclusion reached above, however, may be of little practical value to

Dot–Line. The trustee argues that Dot–Line is an unsecured creditor by virtue of § 506(a) which provides, in pertinent part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property. ...

11 U.S.C. § 506(a). The trustee claims that the senior liens of Tokai and the SBA greatly exceed the value of the collateral and, as a result, Dot–Line has no lien and should be considered an unsecured creditor for purposes of this bankruptcy.

Dot–Line, however, contends that Tokai and SBA do not have liens against the property, much less senior liens, because the merchandise ceased to be part of DAK's inventory upon delivery to Dot–Line. The basis for this argument is that DAK's customers paid for the merchandise, with credit cards, when they placed their orders. As a result, they owned the merchandise, rather than DAK.

The initial difficulty the Court has with this argument is that it appears that Dot–Line is speaking out of both sides of its mouth. Dot–Line claims both that it has a statutorily created lien on the merchandise due to DAK's failure to pay its debts AND that the merchandise does not belong to DAK. However, if the merchandise does not belong to DAK, how can Dot–Line claim assert an interest in it for purposes of satisfying an obligation owed by DAK? Either the merchandise belongs to DAK and Dot–Line has a lien, or the merchandise does not belong to DAK and Dot–Line does not have a lien. Dot–Line simply cannot have it both ways.

Furthermore, the Court is persuaded by the trustee's arguments. DAK clearly had possession, control and legal ownership of the merchandise at the time of the transfer from DAK to Dot–Line. At all times thereafter, DAK retained legal title, and a significant equitable interest therein. DAK, as the seller of the merchandise, had the right and power to stop delivery and obtain the return of the merchandise until such time as it was physically delivered to DAK's retail

customers. DAK's customers had the right to return the merchandise to DAK for a full refund for 30 days after delivery of the merchandise. The only reasonable conclusion to be drawn from this is that the merchandise remained part of DAK's inventory at the time it was delivered to Dot–Line.

This conclusion is supported by the applicable sections of the California Commercial Code. DAK sold its merchandise to customers with a 30–day unconditional return policy. Because of this, title to the merchandise did not transfer to the customer until the 30–day period expired. Section 2326(1) provides that:

> Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to contract, the transaction is
>
> (a) A "sale on approval" if the goods are delivered primarily for use, and
>
> (b) A "sale or return" if the goods are delivered primarily for resale.

*Cal.Comm.Code* § 2326(1). Thus, DAK sold its merchandise on approval. As such, the risk of loss and title to the goods did not pass from DAK to its customers until the customer accepted the goods. Section 2327(1) provides as follows:

> (1) Under a sale on approval unless otherwise agreed
>
> (a) Although the goods are identified to the contract the risk of loss and the title do not pass to the buyer until acceptance;
>
> (b) Use of the goods consistent with the purpose of trial is not acceptance but failure seasonably to notify the seller of election to return the goods is acceptance, and if the goods conform to the contract acceptance of any part is acceptance of the whole; and
>
> (c) After due notification of election to return, the return is at the seller's risk and expense but a merchant buyer must follow any reasonable instructions.

This being the case, the merchandise was part of DAK's inventory at the time it was delivered to Dot–Line. Thus, the merchandise was, and the proceeds continue to be, subject to the senior liens of Tokai and the SBA.

■ This, however, does not end the analysis. Admittedly, Tokai and the SBA have liens which far exceed the proceeds from the sale of the merchandise. However, the merchandise is not the only property securing their liens. It is conceivable that, after recovering on the totality of their other collateral, the Tokai and SBA liens might be reduced to the point that Dot–Line's carrier's lien would be supported by value. However, this Court can make no ruling on this point until more information is provided. Accordingly, this Court will defer a ruling on Dot–Line's status as a secured or unsecured creditor. In the interim, this Court will invoke the marshalling doctrine on SBA and Tokai, which is an equitable doctrine requiring a creditor to look to its other secured assets so as to protect Dot–Line's interest in the proceeds in question here. *See Commonwealth Land Title Co. v. Kornbluth,* 175 Cal.App.3d 518, 220 Cal.Rptr. 774 (1985). The Court further directs that the impounded sums remain impounded until a party files a motion for declaratory relief on the issue or a motion for distribution, and a ruling is entered directing the distribution of the funds.

### RULING

IT IS ORDERED that DAK's Motion for Summary Judgment is denied.

IT IS FURTHER ORDERED, ADJUDGED and DECREED, that defendant, Dot–Line Transportation, is granted summary judgment on the trustee's complaint for avoidance of preferential transfer.